UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Estate of LINDA MILLER, et al.,

Plaintiffs,

v.

COUNTY OF SUTTER, et al.,

Defendants.

No.  2:20-cv-00577-KJM-DMC

ORDER

1    Linda Miller committed suicide in the Sutter County Jail while she was awaiting trial.

2    During the five days between her incarceration and death, she showed clear signs of deteriorating

3    mental health, depression and opioid withdrawal.  Her family claims her death was the needless

4    result of indifference by county officers, cost-cutting by the private companies hired to care for

5    inmates and discrimination, among other wrongs.  Several of the defendants move to dismiss.

6    *See* ECF Nos. 46, 50.

7        The court held a hearing by videoconference on October 16, 2020.  Theresa Zhen and

8    EmilyRose Johns appeared for the plaintiffs.  Wendy Motooka appeared for Nevada County and

9    the individual defendants affiliated with the county.  Ellen Robbins and Evelina Gentry appeared

10   for HIG Capital, LLC and Michael Kuritzky.  Temitayo Peters, who represents Sutter County and

1

several individual Sutter County defendants, monitored the hearing.  For the reasons explained in this order, the court denies the motions in part and grants them in part with leave to amend.

## I.    ALLEGATIONS

At this stage, the court assumes the following allegations are true and views those allegations in the light most favorable to the plaintiffs' case.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Miller was born in Paradise, California, and she grew up nearby.  First Am. Compl. ¶ 73, ECF No. 40.  She began to show signs of depression and anxiety when she was a teenager.  *Id.* ¶ 76.  She also abused drugs.  *Id.*  During her high school years, she was diagnosed with post-traumatic stress disorder and severe depression.  *Id.* ¶ 77.  Her mental health varied.  Sometimes she was well, but often she was agitated, unstable, anxious and aggressive. *Id.* ¶ 79.  She battled addiction for many years, and her substance use led to arrests and incarceration.  *Id.* ¶¶ 79-80.  Her life took a turn for the better when her son was born: she went to drug abuse and recovery classes, saw a counselor and went back to college.  *Id.* ¶ 80.  Once sober, she became an ambassador for her rehabilitation program and worked full time, even achieving financial independence.  *Id.*

But in the summer of 2018, Miller was in a head-on car crash that killed two people and left her in a coma.  *Id.* ¶ 82.  She broke her legs and back and was confined to a wheelchair.  *Id.*  She developed chronic pain, which she managed with a prescription for opioids, but soon she began to self-medicate, first with prescription opioids she bought on the street, then with heroin.  *Id.* ¶¶ 82, 84.  A few months later, the Camp Fire ignited in the mountains above Paradise.  *Id.* ¶ 83.  Miller's apartment and her belongings were destroyed in the flames.  *Id.*  She had no insurance.  *Id.*  Finally, in early 2019, Miller was charged with manslaughter for her role in the car crash.  *Id.* ¶ 85.  She was still recovering from follow-up surgeries and was in a wheelchair when she was arraigned.  *Id.*  She was remanded to custody with bail set at one million dollars.  *Id.* ¶ 86.

When Miller arrived in the Sutter County Jail, she told staff about her injuries from the car crash and her prescription drug use.  *Id.* ¶ 89.  Miller's partner also called the jail to warn about

1   Miller's drug addiction and her suicide risk, but somehow that information never made it to her

2   file, and she was assigned to an ordinary cell in the general jail population. *Id.* ¶¶ 88, 90. After

3   reviewing her condition, a sergeant became concerned that the jail "would have a hard time"

4   taking care of Miller "due to her medical issues." *Id.* ¶ 92. She told her commander, and the

5   commander called other nearby jails to see if one could help. *Id.* Nevada County agreed to house

6   Miller as a courtesy. *Id.*

7       When Miller arrived in the Nevada County Jail that night, she told staff she had a history

8   of seizures, was in pain and was taking medication. *Id.* ¶ 93. Despite a written policy to refer

9   people in Miller's situation to medical care "immediately," the Nevada County Jail did not refer

10  her or review her medical records. *Id.* Miller did speak to a nurse, who made notes about her

11  accident, seizure medications, surgeries, chronic opioid use and severe pain. *Id.* ¶ 94. Miller's

12  intake paperwork also shows she told officers she was using heroin and had night sweats, a

13  cough, fever, weight loss and a loss of appetite, and was spitting up. *Id.* ¶ 95. Her condition

14  worsened. *See id.* ¶ 94. Nevada County jail staff would have seen this had they consulted the

15  Sutter County jail records. *See id.* ¶¶ 93–94. Like Sutter County, Nevada County assigned her to

16  an ordinary cell, not a cell where she would be observed and treated. *See id.* ¶ 96.

17      Later that night, after suffering from violent withdrawal symptoms, Miller nearly died in

18  an apparent suicide attempt. *See id.* ¶¶ 99, 103. She called for help and became increasingly

19  catatonic, but it was hours before she was treated, and the jail did not call paramedics until she

20  was unresponsive. *Id.* ¶ 99. Her diagnosis was both opioid overdose and opioid withdrawal. *See*

21  *id.* ¶ 100.

22      After Miller was hospitalized, the deputy officer of the jail in Nevada County, Sergeant

23  Jeannette Mullenax, decided that Miller should return to Sutter County. Sutter County also

24  agreed to accept her, even though neither party believed the Sutter County Jail could give Miller

25  the care she needed. *Id.* ¶¶ 101, 106. Mullenax also withheld information from Sutter County

26  about Miller's condition and her hospitalization. *See id.* ¶ 101.

27      When Miller arrived back in the Sutter County Jail, she was in so much pain she could not

28  even sit up or sign a form; she lay on the floor during her intake interview. *Id.* ¶ 107. Despite her

obvious pain, a nurse wrote that Miller's pain was zero on a scale of one to ten.  *Id.*  Later that day, jail records show Miller was agitated, lying on the floor, kicking her legs and "sick as a dog." *Id.* ¶ 108.  She told staff she was in chronic pain, had seizures and was addicted to pain medications.  *Id.*

Two more days went by before a therapist evaluated Miller's mental health.  *Id.* ¶ 109.  The records of this evaluation paint a worrisome picture.  According to the therapist's file:

- Miller had been diagnosed with depression and bipolar disorder;
- She had been hospitalized for psychiatric treatment in the past;
- She had been taking an antidepressant before entering the jail;
- She had also taken several psychiatric medications in the past;
- She had been on suicide watch during previous incarcerations;
- She had two previous suicide attempts;
- She had a family history of suicide attempts;
- She was currently showing signs of depression;
- She couldn't eat or sleep and was hallucinating;
- She felt guilty and worthless; and
- She was helpless, hopeless, disheveled and blunted.

*See id.* ¶¶ 110–11.

Still the jail did not place Miller on suicide watch, assign her to an overnight observation unit or urgently refer her for mental health treatment.  *Id.* ¶¶ 111, 119.  Instead, it left her in an ordinary cell with an ordinary metal bedframe and an ordinary bedsheet.  *See id.* ¶ 116.  She did not receive treatment.  *See id.* ¶ 119.  The next day, her bail was increased to $2 million, which was too much for her family to afford.  *Id.* ¶¶ 113.  She committed suicide that night.  *Id.* ¶ 115.  An investigation determined she had asphyxiated from the bedsheet she had tied around her neck.  *Id.* ¶¶ 115, 118.  Only five days had passed since she first came to the Sutter County Jail.  *See id.* ¶ 118.

Miller's death is one of many suicides in Sutter and Nevada county jails over the last several years.  Many of the victims suffered from mental health and substance use problems, and

1    many of these deaths have led to lawsuits.  *See id.* ¶¶ 121–22, 133–35.  A grand jury investigation

2    has also documented, among other problems, inadequate mental-health staffing, inadequate

3    training on suicide prevention and out-of-date healthcare policies in the Sutter County Jail.  *See*

4    *id.* ¶¶ 125–29.  The complaint here mentions only one other death in the Nevada County jail

5    where Miller was briefly housed.  *Id.* ¶ 135.

6         Miller's mother and son, the latter acting through his uncle and guardian ad litem, filed

7    this lawsuit against Sutter and Nevada counties, the two county sheriffs, several officers with

8    responsibilities over the two county jails and several people affiliated with a group of private

9    contractors providing healthcare at both jails.  *See id.* ¶¶ 18–64.  These contractors' names and

10   ownership structures have changed over the years, but according to the complaint, after the

11   corporate obfuscation is stripped away, only two companies remain: (1) HIG Capital, a private

12   equity firm that invests in and manages businesses that provide healthcare in jails and prisons,

13   including 65 facilities in 27 California counties; and (2) Wellpath, a collection of companies

14   managed by HIG that provides healthcare in the Sutter and Nevada county jails.  *See id.* ¶¶ 28–64.

15   HIG oversees the management, training, retention and supervision of the Wellpath employees

16   who work in the two jails where Miller was housed before she died.  *See id.* ¶ 34.  HIG writes

17   policies, establishes practices and standards and manages Wellpath's finances.  *See id.*  It also

18   routinely appoints its own employees and officers to the boards of the companies it manages,

19   including Wellpath, and HIG officers are involved in Wellpath's day-to-day management of

20   healthcare in county jails.  *See id.* ¶ 37.  In short, HIG's goal is to increase the value of its

21   investment, and it does this by carefully controlling Wellpath's operations.  *Id.* ¶ 38.

22        The complaint includes twelve claims:

23        1.  Deliberate indifference to medical and mental health needs in violation of the

24            Fourteenth Amendment (against all defendants), *id.* ¶¶ 155–62;

25        2.  Failure to protect from harm in violation of the Fourteenth Amendment (against all

26            defendants), *id.* ¶¶ 163–70;

27        3.  Municipal liability for violations of the Fourteenth Amendment (against the two

28            counties, HIG and Wellpath), *id.* ¶¶ 171–76;

1            4.    Supervisory liability under 42 U.S.C. § 1983 (against the county sheriffs, several

2                  officers with responsibilities over the two jails, as well as three members of HIG

3                  and Wellpath management), *id.* ¶¶ 177–85;

4            5.    Deprivation of substantive due process in violation of the First and Fourteenth

5                  amendments (against all defendants), *id.* ¶¶ 186–89;

6            6.    Failure to provide or summon medical care in violation of California Government

7                  Code sections 844.6 and 845.6 (against the two counties and a Sutter County

8                  correctional officer), *id.* ¶¶ 190–96;

9            7.    Negligent supervision, training, hiring and retention (against the two counties,

10                their sheriffs, two officers with responsibility over the Sutter County Jail, and two

11                members of HIG and Wellpath management), *id.* ¶¶ 197–201;

12           8.    Wrongful death under California Code of Civil Procedure section 377.60 (against

13                 all defendants), *id.* ¶¶ 202–13;

14           9.    Negligence (against all defendants), *id.* ¶¶ 214–22;

15           10. Violation of the Bane Act, California Civil Code section 52.1 (against all

16                defendants), *id.* ¶¶ 223–30;

17           11. Violation of the Americans with Disabilities Act and the Rehabilitation Act

18                (against the two counties, HIG and Wellpath), *id.* ¶¶ 231–40; and

19           12. Violation of the California Unruh Act, California Civil Code section 51 (against

20                 HIG and Wellpath), *id.* ¶¶ 241–45.

21       HIG, Wellpath, Nevada County and several individual defendants affiliated with these

22 entities move to dismiss the claims against them under Rule 12(b)(6), *see* ECF Nos. 46, 50,[1] and

23 these motions are fully briefed, *see* Opp'ns, ECF Nos. 54, 56; Replies, ECF Nos. 63, 64.[2]

---

[1] Sutter County, the individual Sutter County officers and several individuals affiliated with the jail contractors answered the complaint without moving to dismiss. *See* ECF Nos. 41, 45, 47. References to "defendants" below thus exclude those individuals and entities.

[2] HIG's reply brief includes several paragraphs of single-spaced text that, if properly double-spaced, would likely have caused that brief to exceed the page limits defined in this court's standing order. *See* HIG Reply at 3–6, ECF No. 64; Standing Order at 3–4, ECF No. 3-1. Briefs that do not comply with the court's standing order may be stricken.

## II.   LEGAL STANDARD

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The motion may be granted only if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory. *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013). The court assumes these factual allegations are true and draws reasonable inferences from them. *Iqbal*, 556 U.S. at 678. If the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted. *Id.* at 679.

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible. *Iqbal*, 556 U.S. at 678. In the same vein, conclusory or formulaic recitations of elements do not alone suffice. *Id.* This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense." *Id.* at 679.

## III.   ANALYSIS

### A.   Standing

Nevada County first argues plaintiffs lack standing to pursue a survival action on Miller's behalf because they have not complied with California laws governing survival actions. A plaintiff may pursue a survival action on behalf of a deceased person in federal court. *See Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1228–29 (9th Cir. 2013). "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action." *Id.* (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998)). California's requirements for survival actions are found in California Code of Civil Procedure section 377.30. Under that section and others that follow, the personal representative of a deceased person must execute and file a specific declaration before filing a survival action. *See* Cal. Civ. Proc. Code § 377.32(a). But a plaintiff's failure to file the required declaration does

1    not mean the case must be dismissed; noncompliance may be cured.  *See Frary v. Cty. of Marin*,

2    81 F. Supp. 3d 811, 846 (N.D. Cal. 2015).

3         Here, the plaintiffs claim they have complied with California law governing survival

4    actions, including the declaration requirements of section 377.32.  They point to a declaration by

5    Richard Hyde, *see* ECF No. 44.1, but according to the operative complaint, the estate is

6    administered by Christina Hyde, *see* FAC at 1, ECF No. 40.  The plaintiffs are directed to correct

7    or clarify this apparent inconsistency, assuming they can, and to comply with all applicable

8    provisions of California law governing survival actions.  *See, e.g.*, *Alejandre v. Cty. of San*

9    *Joaquin*, No. 19-233, 2019 WL 2355596, at *2 (E.D. Cal. June 4, 2019).

10        **B.     Broader Defenses by HIG and Wellpath**

11        Before addressing the allegations and claims against them, HIG and Wellpath also

12   advance three broader arguments: (1) the complaint is too vague to give them notice of who did

13   what; (2) the companies and their employees cannot be held liable as alter egos or as agents and

14   principles, and (3) they are not liable under § 1983 because they did not act under color of state

15   law.

16                    **1.     Rule 8 and "Shotgun Pleading"**

17        HIG argues first that the complaint unfairly lumps HIG together with the other defendants

18   and does not explain what it did wrong.  *See* HIG Mot. at 6–7.  It describes the complaint here as

19   a "shotgun pleading."  *See* HIG Mot. at 6.  Courts have used that term to describe several

20   different pleading problems.  Sometimes it is used to describe a complaint that does not

21   differentiate defendants.  *See, e.g.*, *Bonnette v. Dick*, No. 18-0046, 2020 WL 3412733, at *3 (E.D.

22   Cal. June 22, 2020) ("[I]t is not clear which claims Plaintiffs intend to assert against each of the

23   respective Defendants.").  Sometimes it is used to describe a complaint that violates Rule 10(b),

24   which requires a plaintiff to "state its claims or defenses in numbered paragraphs, each limited as

25   far as practicable to a single set of circumstances," and which encourages plaintiffs to separate

26   their claims by "transaction or occurrence."  Fed. R. Civ. P. 10(b); *see also, e.g.*, *Almont*

27   *Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, No. 14-03053, 2015 WL 12777092, at

28   *4 (C.D. Cal. Oct. 23, 2015).  Sometimes "shotgun pleading" has been used to describe a

8

complaint that impermissibly "incorporate[s] each preceding paragraph, regardless of relevancy." *Destfino v. Kennedy*, No. 08-1269, 2009 WL 63566, at *4 (E.D. Cal. Jan. 8, 2009), *aff'd*, 630 F.3d 952 (9th Cir. 2011).

The complaint here is not a shotgun pleading within any of these categories.  It is long, but it is clear and logically organized, and it gives the defendants enough information to understand the legal claims against them and the allegations supporting those claims:

- It introduces the action, *see id.* ¶¶ 1–9;

- It establishes the court's jurisdiction and venue, *see id.* ¶¶ 10–14;

- It explains who the parties are, with separate subsections for Sutter County, Nevada County and the private contractors that operate in the two county jails, *see id.* ¶¶ 15–70, including allegations about why HIG and Wellpath are one and the same entity, *see id.* ¶¶ 28–70;

- It alleges compliance with exhaustion requirements, *see id.* ¶¶ 71–72;

- It alleges who did what and when, *id.* ¶¶ 73–154;

- It claims the defendants violated the law and explains why, using separate subsections for each of the twelve claims, and each subsection includes a heading describing the legal basis for the claim and a list of the defendants against whom that claim is asserted, *see id.* ¶¶ 155–245;

- It requests relief, *see id.* at 61; and

- It demands a jury trial, *see id.* at 62.

To be sure, the complaint here could be clearer, shorter and more incisive.  *Cf.* Fed. R. Civ. P. Forms 10–29; *McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996).  But it meets the standards of Rule 8(a) and 10(b).

## 2.   Alter Ego Liability

HIG and Wellpath next argue the complaint does not make out a plausible case that they and one of their executives, Michael Kuritzky, are liable for the others' alleged wrongs.  *See* HIG Mot. at 7–9.  The parties appear to agree that California law governs this determination, *see id.*; Opp'n HIG Mot. at 9–14, and the court assumes for purposes of this order that it does.

9

The contractors first argue that the complaint's factual allegations do not support the plaintiffs' claim that HIG, Wellpath and Kuritzky are "alter egos."  A corporation ordinarily enjoys the "statutory privilege" of a "separate personality" from its shareholders and other corporations.  *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985) (quoting Comment, "Corporations: Disregarding Corporate Entity: One Man Company," 13 Cal. L. Rev. 235, 237 (1925)).  But this separate personality "must be used for legitimate business purposes and must not be perverted."  *Id.* (quoting Comment, *supra*, 13 Cal. L. Rev. at 237).  A court may therefore disregard a corporation's separate status and hold individual shareholders or another entity liable for the corporation's actions if necessary to prevent abuses and injustice.  *See id.*  Here, for example, if the plaintiffs proved it would be correct to do so, the court could disregard that HIG, its owners and its portfolio companies are different corporate entities and hold each responsible for what the others have done.  *See id.* at 300–01.

California courts have described two broad requirements for plaintiffs who invoke this so-called corporate "alter ego" or "veil-piercing" doctrine: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual"—or of two entities—"no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow."  *Automotriz Del Golfo De Cal. S. A. De C. V. v. Resnick*, 47 Cal. 2d 792, 796 (1957).  This is no "litmus test."  *Mesler*, 39 Cal. 3d at 300.  "[T]he result will depend on the circumstances of each particular case."  *Id.*  It is "normally a question of fact."  *Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811 (2010).  There are many factors to consider.  *Id.*  Does the corporation issue stock and have stockholders, for example, or does it appear to be an empty shell designed to serve "the interests of another corporation or an individual"?  *Automotriz*, 47 Cal. 2d at 796.  Or is the corporation operating with so little capital that it would probably not be able to "meet its debts"?  *Id.* at 796–97 (citation omitted).  Do two entities mix their funds or other assets?  *See Assoc. Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838–40 (1962).  Do they have the same address, employees and management?  *See id.*  Does a company actually observe corporate formalities, such as holding meetings keeping minutes and other

1    records? *See id.* Do parents, affiliates and subsidiaries conceal or confuse their identities so as to

2    unfairly insulate owners and their assets from liability? *See id.*

3        The complaint here includes several pages of allegations illustrating how the plaintiffs

4    intend to prove that the companies under the "Wellpath" umbrella are not really separate from

5    HIG, but rather instruments that HIG wields to artificially divorce its profits from its liabilities.

6    For example, the complaint alleges the names of these entities and their relationships have

7    converged as a result of rebranding efforts and the consolidation of control in HIG. *See, e.g.*,

8    FAC ¶¶ 34, 40. It alleges HIG controls the companies that actually provide healthcare in county

9    jails and directs day-to-day operations by creating policies, setting strategic goals, installing

10    executives and board members, and choosing who will work in jails as supervisors, doctors and

11    nurses. *See, e.g.*, *id.* ¶¶ 34–36. It alleges HIG and its owners have attempted to increase the value

12    of their investment by collecting profits and gains while saddling subsidiaries with liabilities and

13    losses, entities HIG creates specifically for that purpose. *See, e.g.*, *id.* ¶¶ 38, 40, 44. It also

14    alleges that if HIG and Wellpath are not treated as the same entity, HIG will continue depriving

15    inmates of healthcare and preventing improvements to California jails, even after successful civil

16    rights lawsuits. *Id.* ¶¶ 44–45. These are allegations only and HIG may well disprove them. But

17    they are factual allegations, and at this stage, the court must assume they are true. Doing so, the

18    court infers a plausible theory of alter-ego liability.

19        Many of these allegations also meet no resistance in HIG's motion to dismiss. For

20    example, HIG does not contest the allegation that the organizational defendants under the

21    "Wellpath" umbrella are not actually separate entities. HIG argues instead the complaint is too

22    conclusory in its allegation that Wellpath is the alter ego of HIG. *See id.* at 7 (arguing plaintiffs'

23    attempt "to make HIG liable for CMFG's actions" rests on "conclusory" claims). HIG is correct

24    that the court does not blindly accept conclusions, "labels," "unadorned" accusations and "naked

25    assertion[s]" when evaluating a motion to dismiss under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678

26    (alteration in original, citation omitted). HIG is also correct that a plaintiff cannot defeat a motion

27    to dismiss by making the unelaborated assertion that a company is a "shell," *see Wine Bottle*

28    *Recycling, LLC v. Niagara Sys. LLC*, No. 12-1924, 2013 WL 1120962, at *9 (N.D. Cal. Mar. 18,

1  2013), or that it would be "inequitable" not to treat defendants as alter egos, *Neilson v. Union*

2  *Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003).

3        But the complaint here includes more than labels, conclusions and naked assertions. *See*

4  *supra* at 11.  The section of the complaint that describes HIG and Wellpath is several pages and

5  dozens of paragraphs long.  *See* FAC at 11–19.  Similar allegations, and even much more modest

6  allegations, have sufficed to support a claim that one entity is the alter ego of another in

7  California federal district courts.  In a case against a publisher and its affiliates, for example, the

8  plaintiff survived a motion to dismiss despite alleging only that defendants had used the same or

9  very similar names, a parent controlled its subsidiaries, and the companies had commingled

10  funds.  *See Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 961–62 (N.D. Cal.

11  2015).  In a case of allegedly unpaid invoices, the court held the plaintiff had "properly alleged a

12  unity of interests" among defendants—i.e., that its complaint satisfied the first part of the alter-

13  ego test—by alleging simply that one entity "directed and controlled" the other, which was

14  allegedly a "mere instrumentality, agency, conduit, or adjunct."  *Daewoo Electronics Am., Inc. v.*

15  *Opta Corp.*, No. 13-1247, 2013 WL 3877596, at *5 (N.D. Cal. July 25, 2013).  In another case

16  about reimbursement for healthcare services, the plaintiffs survived a motion to dismiss by

17  alleging that some of the defendants had commingled assets and operations, ignored corporate

18  formalities and exercised control over others.  *See In re Out of Network Substance Use Disorder*

19  *Claims*, No. 19-2075, 2020 WL 2114934, *11–12 (C.D. Cal. Feb. 21, 2020).  And in *Pacific*

20  *Maritime Freight, Inc. v. Foster*, the Southern District court concluded it was enough for the

21  plaintiff to plead that a person was the sole owner of the alleged alter ego and the two

22  commingled funds.  *See* No. 10-0578, 2010 WL 3339432, at *6–7 (S.D. Cal. Aug. 24, 2010).

23  California courts have sometimes required even less.  *See, e.g.*, *Paul v. Palm Springs Homes Inc.*,

24  192 Cal. App. 2d 858, 863 (1961) (enough for plaintiff to allege sole ownership alone).

25        As HIG points out, however, another California district court has held that HIG,

26  specifically, is not the alter ego of its portfolio companies.  In January 2019, an inmate in the

27  Ventura County Jail committed suicide, and his family sued the county, HIG, an executive and

1    others.  *See Estate of Ricardez v. County of Ventura*, No. 20-00079 (C.D. Cal. filed Jan. 3, 2020).³

2    HIG moved for judgment on the pleadings, arguing among other things the complaint could not

3    support any alter ego claims against it.  *See generally* Mot., No. 20-00079 (C.D. Cal. May 8,

4    2020), ECF No. 89.  The court granted HIG's motion, finding the plaintiffs' allegations were too

5    "general" and "conclusory" to support their claims of "a unity of interest" or that it would be

6    "inequitable to recognize the corporate form."  2020 WL 3891460 at *3–4 (C.D. Cal. June 24,

7    2020).

8           In reaching this conclusion, the Central District court did not cite or distinguish any of the

9    decisions summarized above.  *See id.* at *4–5.  It relied instead on five older decisions addressing

10   complaints without factual allegations.  In two of these cases, the plaintiffs had not even bothered

11   to name the elements of the alter ego test.  *See Wady v. Provident Life & Accident Insurance Co.*

12   *of America*, 216 F. Supp. 2d 1060, 1067 (C.D. Cal. 2002) (complaint had not even included

13   "allegations regarding the relationship between" the two companies that were supposedly alter

14   egos); *Hokama v. E.F. Hutton & Co.*, 566 F. Supp. 636, 647 (C.D. Cal. 1983) ("If plaintiffs wish

15   to pursue such a theory of liability, they must allege the elements of the doctrine.").  In another,

16   the plaintiff had relied on just one conclusory assertion: one defendant had "exercised such

17   dominion and control over its subsidiaries" that it should be liable.  *In re Currency Conversion*

18   *Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003).  In the fourth cited case, the

19   complaint offered even less: only the allegation "upon information and belief" that two

20   companies "controlled" a third.  *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 01-2946, 2002

21   WL 432390, at *12 (S.D.N.Y. Mar. 20, 2002).  In the fifth case, the defendants did not dispute the

22   complaint included allegations showing they had a unity of interests.  *See Neilson*, 290 F. Supp.

23   2d at 1116–17.  The court dismissed the complaint instead because the plaintiff had relied on the

24   conclusory claim that it would be difficult to collect a judgment, which California courts had

25   squarely rejected as a justification for treating corporations as alter egos.  *See id.* at 1117–18

---

³ The court takes judicial notice of this document and others filed in that case.  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record").

1    (citing, among other cases, *Virtualmagic Asia, Inc. v. Fil–Cartoons, Inc.*, 99 Cal. App. 4th 228,

2    245 (2002)).  This court therefore declines to follow the Central District court's decision in *Estate*

3    *of Ricardez v. County of Ventura*.  The factual allegations here suffice at this stage to support the

4    plaintiffs' claim that HIG and Wellpath should be treated as alter egos.

5         HIG also urges the court to dismiss under a stricter pleading standard imposed in

6    *Gerritsen v. Warner Brothers Entertainment Inc. See* Reply at 6 (citing 116 F. Supp. 3d 1104

7    (C.D. Cal. 2015)).  This court declines to adopt the reasoning of *Gerritsen* for three reasons, as

8    explained below.

9         First, in *Gerritsen*, the court appears to have relied on an incorrect conception of

10   California and Ninth Circuit law.  It required the plaintiff to plead that one company had

11   "dictate[d]" every "facet" of the other's business, *id.* at 1142, citing a line of cases leading back to

12   the Ninth Circuit's decision in *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001).[4]  In

13   *Unocal*, the court introduced the doctrine of alter ego liability by offering examples of corporate

14   relationships that satisfy the test.  *See id.* at 926–27.  The second of three examples it offered was

15   *Rollins Burdick Hunter of Southern California, Inc. v. Alexander & Alexander Services, Inc.*, a

16   case in which one company had not only exercised abnormally extensive control over the other,

17   but had dictated "every facet" of the business.  *See id.* (quoting 206 Cal. App. 3d 1, 11 (1988)).

18   *Doe* and *Rollins* thus illustrate a sufficient condition of alter-ego liability, not a necessary

19   condition.  A plaintiff can state a claim by explaining in detail how one company dictated every

20   facet of the other's business, but doing so is not necessary.[5]  "The conditions under which a

21   corporate entity may be disregarded vary according to the circumstances in each case."  *Paul*, 192

22   Cal. App. 2d at 862.

---

[4] As the Ninth Circuit has since recognized, some holdings in *Unocal* have been abrogated, *see Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1021 (9th Cir. 2017), but not the holdings described here.

[5] For the same reasons, the court declines to follow *Bible-Marshall v. Montgomery County*, No. 20-0028, slip op. at 7 (S.D. Tex. Sept. 27, 2020), ECF No. 47 (dismissing alter-ego claims against HIG because the complaint did not "create a reasonable inference that [HIG] exercised complete domination and control").

14

Second, the allegations here permit a reasonable inference of "manipulative control," which the Central District court found lacking in *Gerritsen*.  *See* 116 F. Supp. 3d at 1142. According to the complaint in this case, HIG has attempted to insulate itself from the legal and financial consequences of cost-cutting by foisting liabilities onto its portfolio companies, while saving their revenues for itself.  *See, e.g.*, FAC ¶¶ 38, 40, 44–45.  It carries out these cost-cutting measures by controlling Wellpath's day-to-day healthcare operations within county jails.  *See, e.g., id.* ¶¶ 34–36.  The result, according to the complaint, is a fifty percent higher mortality rate in the facilities served by HIG and Wellpath.  *See id.* ¶ 142.

Third, the pleading standard imposed in *Gerritsen* is stricter than that required by the Supreme Court and Ninth Circuit.  The court in that case dismissed the plaintiff's alter-ego claim despite detailed and extensive allegations: one company was the sole owner of the others; they shared an office, website, telephone and several board members and employees; one of the companies referred to the others as its own "divisions" or "units"; the companies had commingled their funds; and one company had decided how many movies the others could produce, even down to particular genres.  *See* 116 F. Supp. 3d at 1138–43.  The standard at this stage is not so strict.  A plaintiff's allegations need not "be true or even probable."  *Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011).  They "need only 'plausibly suggest an entitlement to relief.'" (quoting *Iqbal*, 556 U.S. at 679).  That is so even if the defendant advances a plausible explanation of its own.  *See id.* at 1217.  The court draws inferences in the plaintiff's favor, as it must.  *See Iqbal*, 556 U.S. at 678.  Lengthy and detailed factual allegations are thus unnecessary if the complaint makes out a plausible case without them, as is the case here.  *See, e.g., Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 (9th Cir. 2012) ("[I]n many straightforward cases, it will not be any more difficult today for a plaintiff to meet [her] burden than it was before the [Supreme] Court's recent decisions [in *Iqbal* and *Twombly*]." (alterations in original) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010)).

HIG also cites many cases decided in very different procedural circumstances, namely when a defendant asserts a lack of personal jurisdiction.  *See, e.g.*, Reply at 5, ECF No. 64 (citing *Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015); *Kramer Motors, Inc. v. British Leyland, Ltd.*,

15

1    628 F.2d 1175 (9th Cir. 1980) (per curiam); and *Barantsevich v. VTB Bank* 954 F. Supp. 2d 972

2    (C.D. Cal. 2013)).  When a court ascertains its personal jurisdiction, it consults the plaintiff's

3    evidence.  *See, e.g., Ranza*, 793 F.3d at 1068.  Here, by contrast, the court must decide whether

4    the plaintiffs' allegations, if true, could support a plausible claim of alter-ego liability.  *Iqbal*,

5    556 U.S. at 678–79.  The court does not assess evidence.

6         In addition to alleging a plausible claim of vicarious alter-ego liability, the complaint's

7    allegations also allow a plausible inference that Wellpath is an agent of HIG.  FAC ¶ 57.  Under

8    California law, an agency relationship has three "essential characteristics":

9              1.   The agent "holds a power to alter the legal relations between the principal and

10                  third persons and between the principal and himself."

11             2.   The agent is a "fiduciary with respect to matters within the scope of the agency."

12             3.   The principal "has the right to control the conduct of the agent with respect to

13                  matters entrusted to him."

14   *Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp.*, 148 Cal. App. 4th 937, 964 (2007)

15   (Cantil-Sakauye, J.) (quoting *Alvarez v. Felker Mfg. Co.*, 230 Cal. App. 2d 987, 999 (1964)).

16        "A corporation may be held vicariously liable as a principal for the torts of its agents."

17   *Secci v. United Independent Taxi Drivers, Inc.*, 8 Cal. App. 5th 846, 855 (2017).  "Control is the

18   key characteristic . . . ."  *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 541

19   (2000).  The alleged principal's control must be "over and above that to be expected as an

20   incident of [its] ownership."  *Cohen v. TNP 2008 Participating Notes Program, LLC*, 31 Cal.

21   App. 5th 840, 862, (2019) (citation omitted).  It must show a "purposeful disregard" of

22   "independent corporate existence."  *Id.* (citation omitted).  "As a practical matter," this occurs

23   when one entity has "moved beyond the establishment of general policy and direction" and has in

24   effect taken over the other's "day-to-day operations in carrying out that policy."  *Sonora*, 83 Cal.

25   App. 4th at 542 (emphasis omitted).

26        Although the principal-agent theory of liability is similar to the alter-ego theory of

27   liability, the two are distinct.  As discussed above, a defendant's liability as an alter ego arises

28   from its abuse of its separate personality and the resulting injustice, whereas agency is primarily a

16

1   question of control, authority and power.  *See, e.g.*, *Sonora*, 83 Cal. App. 4th at 541 & n.9.  That

2   said, "many courts have failed to distinguish, accurately or at all, between an agency analysis and

3   an alter ego analysis."  *Id.* at 540 (discussing these rules as they apply to a state court's

4   jurisdiction over an out-of-state corporation).

5          Indeed many of the allegations that support the plaintiffs' claims of an alter-ego

6   relationship here also support their claims of a principal-agent relationship.  They allege, for

7   example, that HIG controls the day-to-day operations of the companies that provide healthcare in

8   county jails by creating policies and strategies and by choosing who will work in prisons as

9   supervisors, doctors and nurses.  *See, e.g.*, *id.* ¶¶ 34–36.  They allege HIG has installed its own

10  personnel as Wellpath's officers and directors and HIG uses Wellpath as an instrument to cut

11  costs and insulate itself from liabilities.  *See, e.g.*, *id.* ¶¶ 34–36, 38, 40, 44.  These allegations

12  allow plausible inferences that HIG vested authority in Wellpath to act on its behalf and in its

13  interest within county jails and that HIG's control went well beyond the ordinary control an

14  investor might exercise over a portfolio company.  The complaint here goes beyond the sort of

15  legal recitations courts have dismissed under Rule 12(b)(6).  *See, e.g.*, *Ruhnke v. SkinMedica,*

16  *Inc.*, No. 14-0420, 2014 WL 12577172, at *11 (C.D. Cal. Sept. 5, 2014); *Imageline, Inc. v.*

17  *CafePress.com, Inc.*, No. 10-9794, 2011 WL 1322525, at *4 (C.D. Cal. Apr. 6, 2011).  Its

18  allegations are similar to those that have survived motions to dismiss.  *See, e.g., In re Out of*

19  *Network Substance Use Disorder Claims*, 2020 WL 2114934, at *12.  More "precise details" are

20  not necessary at this early point in the litigation.  *Pascal v. Argenta,* No. 19-2418, 2019

21  WL 5212961, *3 (N.D. Cal. Oct. 16, 2019) (quoting *Kristensen v. Credit Payment Servs.*, 12 F.

22  Supp. 3d 1292, 1301 (D. Nev. 2014)).  The specifics are better reserved for summary judgment.

23  *See Banks v. N. Tr. Corp.*, 929 F.3d 1046, 1054 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 1243

24  (2020) ("[C]ourts generally determine the existence of an agency relationship at the summary

25  judgment stage, not in determining a motion to dismiss.").

26          What the complaint does not allege, however, is that HIG or Wellpath is an alter ego of

27  Kuritzky or that he is liable as a principal.  No factual allegations describe, for example, how

28  Kuritzky abused HIG's or Wellpath's separate status or how he endowed anyone else with

17

1   authority to act on his behalf.  The court grants HIG's motion to that extent.  On these allegations,

2   the plaintiffs may not pursue claims against Kuritzky based on alter-ego or principal-agent

3   theories of liability, but they are granted leave to amend their complaint with the necessary

4   factual allegations, if they are able to amend.  *See, e.g.*, *Cafasso, U.S. ex rel. v. Gen. Dynamics C4*

5   *Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) ("[W]hen a viable case may be pled, a district

6   court should freely grant leave to amend.").

7          The court does not reach the plaintiffs' alternative arguments that HIG and Wellpath have

8   created a joint venture or that HIG has ratified Wellpath's actions, which are not asserted in the

9   operative complaint.  *See* HIG Opp'n at 11–14.  Nor has the court relied on the documents of

10  which the plaintiffs request judicial notice.  *See* Req. J. Not., ECF No. 55; *Apple Inc. v. Allan &*

11  *Assocs. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020) ("[T]he complaint may not be amended by

12  the briefs in opposition to a motion to dismiss." (citation omitted)).  That request and HIG's

13  related motion to strike, ECF No. 58, are thus denied as moot.  The plaintiffs may amend their

14  complaint to assert these new facts and theories of liability if they can do so while complying

15  with Federal Rule of Civil Procedure 11.

16                    **3.      Action Under Color of State Law**

17         HIG and Wellpath next argue they cannot be liable under § 1983 because they are private

18  companies and were not acting "under color of state law."  A private defendant can, however, be

19  liable under § 1983 for actions under color of state law.  *West v. Atkins*, 487 U.S. 42, 54 (1988).

20  In *West*, for example, the Supreme Court held "a physician employed by [a state] to provide

21  medical services to state prison inmates[] acted under color of state law for purposes of § 1983"

22  when he treated an inmates' injuries.  *Id.*  The Ninth Circuit has extended that rule to private

23  entities "under contract" with a state "to provide medical services."  *Lopez v. Department of*

24  *Health Services*, 939 F.2d 881, 883 (9th Cir. 1991) (per curiam).  Another judge of this court has

25  determined that private doctors and hospitals contracting "with a public prison system to provide

26  treatment to inmates" perform a public function and thus act under color of state law.  *Long v.*

27  *Corizon Health, Inc.*, No. 17-00898, 2018 WL 5962499, at *4 (E.D. Cal. Nov. 14, 2018), *report*

28  *and recommendation adopted*, 2018 WL 6528421 (E.D. Cal. Dec. 12, 2018); *accord, e.g.*, *Oyenik*

1    *v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (unpublished) (the action of "a

2    corporation contracted by the State of Arizona to provide medical treatment to state prisoners"

3    was "fairly attributable to the State" and could "therefore give rise to § 1983 liability").  HIG and

4    Wellpath offer no viable distinction between the "state action" in these cases and their own

5    provision of healthcare in county jails.  The court can find none.  Because the complaint permits a

6    plausible inference of HIG's liability under an alter-ego or principle-agent theory, as discussed

7    above, HIG may be liable under § 1983 as well.

8         What is left, then, are plaintiffs' allegations against Kuritzky.  The complaint does not

9    allege that Kuritzky is a doctor, has any healthcare education or training or made decisions about

10   Miller's healthcare.  He sits on company boards, holds executive positions, sets policies and takes

11   care of budgets and finances.  *See* FAC ¶ 48.  These are not inherently public functions, and the

12   complaint does not suggest the two counties acted in concert with Kuritzky.  *Cf. Single Moms,*

13   *Inc. v. Montana Power Co.*, 331 F.3d 743, 747 (9th Cir. 2003) (describing the joint action and

14   public function tests for action under color of state law).  Nor is it possible to infer a "close

15   nexus" between his actions and the two counties or that the state compelled him to do anything.

16   *Cf. id.* (describing nexus and compulsion tests).  Kuritzky may very well have clear connections

17   to county jails, and his decisions might affect inmates' health, but such links have not qualified a

18   private person as a government actor.  *See, e.g.*, *Kirtley v. Rainey*, 326 F.3d 1088, 1095 (9th Cir.

19   2003) (holding guardian ad litem was not state actor even though guardian was appointed by a

20   state actor, paid by the state and subject to state regulation).

21        The complaint thus allows the inference that HIG and Wellpath, but not Kuritzky, were

22   acting under color of state law.  The court grants the motion to dismiss the federal constitutional

23   claims against Kuritzky but does not reach the substance of those claims.  Because the complaint

24   could state a claim if it included allegations showing Kuritzky acted under color of state law, the

25   plaintiffs are granted leave to amend.

26   /////

27   /////

**C.     Substantive Claims**

The court next considers the substance of the complaint's twelve claims.

**1.     Deliberate Indifference to Serious Medical Needs**

In their first claim, the plaintiffs allege the defendants acted with deliberate indifference to Miller's serious medical needs in violation of the Fourteenth Amendment. The complaint includes claims of deliberate indifference against both individual and organizational defendants. *See* FAC at 41. Organizational defendants are not vicariously liable for the torts of their employees and agents under § 1983. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Castro v. City of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc). But entities may be liable for their unconstitutional policies and customs, *see, e.g.*, *Castro*, 833 F.3d at 1073, as the plaintiffs assert separately in their third claim here. The plaintiffs agreed at hearing that because their constitutional claims of deliberate indifference could proceed against Nevada County, Sutter County, HIG and Wellpath under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), claim one against these entities may be dismissed without leave to amend.

For the individual defendants, Sheriff Moon and Sergeant Mullenax, the plaintiffs' claim has four elements:

1.     The defendant made an intentional decision about the plaintiff's medical care. *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

2.     That decision "put the plaintiff at substantial risk of suffering serious harm." *Id.*

3.     "[T]he defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Id.* "[T]he defendant's conduct must be objectively unreasonable." *Id.* (quoting *Castro*, 833 F.3d at 1071).

4.     "[B]y not taking such measures, the defendant caused the plaintiff's injuries," *id.*, both actual cause and proximate cause, *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013).

Here, Sutter County transferred Miller to Nevada County Jail because Sutter County could not give her the treatment she needed.  FAC ¶¶ 92–93.  When Miller arrived, staff learned she suffered from seizures and chronic pain, was taking medication for both conditions and was misusing opioids.  *See id.* ¶¶ 93–96.  She was nevertheless assigned to a cell in the general population.  *See id.*  That night, staff waited for several hours while Miller suffered in pain, called for help, became catatonic and finally stopped responding before they called paramedics and sent her to the hospital.  *See id.* ¶¶ 99–100.  These allegations paint a troubling picture of mistreatment and indifference, but they do not describe any wrongdoing or inaction by the Sheriff or Sergeant Mullenax.

The complaint does, however, go on to allege that Mullenax decided to transfer Miller back to Sutter County.  *See id.* ¶ 101.  It is reasonable to infer that Mullenax knew Sutter County had transferred Miller because it could not provide necessary treatment, that she knew Miller might have just attempted to take her own life in Nevada County and that Mullenax did not explain this "critical information" to the Sutter County jail.  *Id.*  As a result, Miller was housed in the general population in Sutter County and died just a few days later.  *See id.* ¶¶ 101, 115.  At this early stage of the litigation, these allegations satisfy each of the four elements above: (1) Mullenax made a deliberate decision to transfer Miller to a facility that believed itself incapable of caring for Miller, without forwarding information about her hospitalization; (2) that decision put Miller at risk of another opioid-related medical crisis or suicide; (3) a reasonable officer in Mullenax's situation would have known the transfer placed Miller at great risk of harm; and (4) Miller's death was the result.

Nevada County objects that the complaint does not explain in enough detail what information Mullenax withheld.  *See, e.g.*, Nevada Cty. Mot at 8–9.  The complaint could certainly have been more specific about what "critical information" Mullenax withheld, but at this stage, the plaintiffs are not required to advance "detailed factual allegations."  *Twombly*, 550 U.S. at 555.  It is reasonable to infer that Mullenax did not say enough, or anything at all, about Miller's hospitalization and "what appeared to be a suicide attempt."  *See* FAC ¶¶ 101, 113.  If

1   staff at the Sutter County Jail had known what had happened the night before, it may very well

2   have taken steps to prevent her suicide.  These allegations suffice.

3          Nearly identical reasoning led the Ninth Circuit to vacate an order granting summary

4   judgment in *Conn v. City of Reno*, 572 F.3d 1047 (9th Cir. 2010), *judgment vacated*, 563 U.S.

5   915, *and opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).  In *Conn*, a woman

6   who had suffered from a long history of drug and alcohol abuse attempted to commit suicide in

7   the back of a police car.  *See id.* at 1051.  The officers did not report her suicide attempt and did

8   not take her to the hospital.  *Id.*  She was released, detained again the next day, and committed

9   suicide in her cell the day after that.  *Id.* at 1051–52.  That was enough to support her claim that

10  the officers who said nothing about her suicide attempt were deliberately indifferent to her serious

11  medical needs.  *See id.* at 1055–62.  So too here.  Mullenax's alleged failure to report a potential

12  suicide attempt is enough to state a claim.

13         Nevada County argues *Conn* is not controlling here.  It points out the officers' inaction in

14  *Conn* deprived the victim of any mental-health screening whatsoever.  And here, in contrast with

15  *Conn*, the complaint alleges Miller was interviewed several times, once by a therapist.  *See, e.g.*,

16  FAC ¶¶ 110–11.  Despite that difference, the Ninth Circuit's reasoning remains instructive.  As

17  explained above, it is reasonable to infer that Nevada County representatives did not explain to

18  Sutter County that Miller's overdose was an apparent suicide attempt.  As a result, decisions

19  about her mental health once she returned to Sutter County were "never made by someone who

20  had all the requisite information about her psychological instability at the time."  *Conn*, 572 F.3d

21  at 1060 (emphasis omitted).

22         The intervening causes described in the defendants' motions do not break the chain of

23  causation here.  *See Conn*, 572 F.3d at 1061.  For claims under § 1983, it is enough that the

24  defendants' actions were merely "one of the causes" of the injury, a "moving force" behind the

25  suicide, as long as the intervening cause was foreseeable.  *Id.* at 1060–61 (quoting *White v. Roper*,

26  901 F.2d 1501, 1506 (9th Cir. 1990)).  The Ninth Circuit has reaffirmed this rule several times

27  and often has permitted plaintiffs to rely on allegations or evidence showing the defendants were

1    only one cause among many, even causes that might arguably have been more direct.[6]  In *Conn*,

2    for example, the foreseeable "intervening stressor" was a later arrest.  *Id.* at 1061.  Here, it was an

3    unfavorable outcome at a bail hearing with continued detention.  *See* FAC ¶¶ 113–15.  Neither

4    broke the chain of cause and effect.  The complaint's allegations give Mullenax "fair notice" of

5    the case against her, allow her to prepare a defense, and with all reasonable inferences drawn in

6    the plaintiffs' favor, the complaint "plausibly suggest[s] an entitlement to relief."  *Starr*, 652 F.3d

7    at 1216.

8         The court grants the motion in part with leave to amend and denies it in part: claim one

9    against Sheriff Moon is dismissed with leave to amend; claim one against Mullenax is dismissed

10   with leave to amend insofar as that claim relates to the treatment of Miller's opioid-related

11   medical crisis; and the motion is denied with respect to the claim Mullenax acted with deliberate

12   indifference while returning Miller to Sutter County's custody.

13                **2.      Failure to Protect from Harm**

14        The plaintiffs claim defendants failed to protect Miller from harm in violation of the

15   Fourteenth Amendment.  The defendants argue this claim is indistinguishable from the first.

16   Nevada Cty. Mot. at 9; HIG Mot. at 14.  The plaintiffs do not argue otherwise.  *See* Nevada Ct.

17   Opp'n at 9; HIG Opp'n at 17–18.  The Ninth Circuit has "long analyzed claims that government

18   officials failed to address pretrial detainees' medical needs using the same standard as cases

19   alleging that officials failed to protect pretrial detainees in some other way."  *Gordon v. Cty. of*

20   *Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 794 (2019).  The

---

[6] *See Castro*, 833 F.3d at 1073 (permitting plaintiff to prove causation by showing officers placed him in holding cell when he was drunk and could not defend himself from violent cellmate); *Lemire*, 726 F.3d at 1080–81 (permitting plaintiffs to show defendants were deliberately indifferent when they left mentally ill inmate alone for three hours); *White*, 901 F.2d at 1505–06 (permitting plaintiff to establish deliberate indifference by proving officers tried to force him into violent inmate's cell, leading him to resist and try running, only to be injured when officers restrained him); *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1457 (9th Cir.1988), *vacated*, 490 U.S. 1087 (1989), *and reinstated*, 886 F.2d 235 (9th Cir.) (finding policy of inadequate care was moving force behind inmate's suicide after he was returned to general population, got in fight, and placed in isolation).

1   defendants' motions to dismiss this claim are thus granted in part and denied in part to the same

2   extent as the motions to dismiss the first claim.

3               **3.      Municipal Liability**

4         In their third claim, the plaintiffs allege the jail medical programs of Nevada County, HIG

5   and Wellpath were deliberately indifferent to inmates' serious medical needs.  "In order to

6   establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's

7   injury."  *Castro*, 833 F.3d at 1073 (quoting *Monell*, 436 U.S. at 694).  The plaintiff must

8   demonstrate this policy or custom "reflects deliberate indifference to the rights of its inhabitants,"

9   and there must be a "direct causal link between a municipal policy or custom and the alleged

10  constitutional deprivation."  *Id.* at 1073, 1075 (quoting *City of Canton v. Harris*, 489 U.S. 378,

11  385, 392 (1989)).  Private entities acting under color of law may also be liable under *Monell*.

12  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).

13        Here, the complaint alleges Nevada County's de facto policy was to deny medical and

14  psychiatric attention to inmates, to not identify and treat newly arrived prisoners who were

15  suffering from drug withdrawal or mental health problems, and to not train and supervise jail staff

16  on handling suicidal inmates.  *See* FAC ¶ 173; *see also* Nevada Cty. Opp'n at 8 (summarizing

17  complaint similarly).  But the complaint offers very few facts to support that conclusion.  It

18  identifies only one other overdose in Nevada County jail.  *See* FAC ¶ 135.  And contrary to the

19  plaintiffs' argument, they have not actually alleged that Nevada County "has an extensive and

20  tragic history of prisoners in its custody dying from drug overdoses and suicides" or a history "of

21  failing to provide adequate medical care to prisoners."  Nevada Cty. Opp'n at 8.  Plaintiffs instead

22  have alleged that investigations in other counties have uncovered problems and that many inmates

23  have died in other jails.  *See* FAC ¶¶ 133–37.  These allegations do not support broad claims of

24  unconstitutional policies in the Nevada County Jail.  *See, e.g.*, *Clouthier v. Cty. of Contra Costa*,

25  591 F.3d 1232, 1251–52 (9th Cir. 2010), *overruled in part on other grounds by Castro*, 833 F.3d

26  at 1070 (holding deceased plaintiff's estate could not support claim of unconstitutional prison

27  mental healthcare policies without evidence of "a longstanding custom or practice" or failures

1   that "happened so frequently that the need for corrective measures" would have been "plainly

2   obvious" (quoting *City of Canton*, 489 U.S. at 390 n.10)).

3        The complaint does, by contrast, include specific factual allegations about HIG and

4   Wellpath.  The plaintiffs allege, for example, that HIG and Wellpath were aware their doctors and

5   nurses were treating "more and more individuals with acute mental health diagnosis and

6   substance use disorders."  FAC ¶ 41.  Plaintiffs allege more than ninety people have "died of

7   suicide or a drug overdose while in the custody of a jail served by [Wellpath]."  *Id.* ¶ 135.  Grand

8   juries in other counties have criticized Wellpath "for how it handles prisoner detoxification," have

9   found "the company's procedures failed to detect people at risk for alcohol withdrawal," and have

10  concluded drug and alcohol withdrawal "played key roles in three deaths."  *Id.* ¶¶ 134, 143–44.

11  Wellpath has faced repeated complaints of inadequate mental healthcare.  *See, e.g.*, *id.* ¶¶ 140–41,

12  145–52.  And according to an analysis by *The Sacramento Bee*, mortality rates are fifty percent

13  higher in jails managed by Wellpath than in other jails.  *Id.* ¶ 142.

14       These allegations suffice to state a claim that HIG and Wellpath maintained a policy of

15  inaction that amounted to deliberate indifference.  *See, e.g.*, *Oviatt By & Through Waugh v.*

16  *Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992) (several incidents over period of several years

17  should have alerted defendant that its policies were unconstitutional).  It is reasonable to infer a

18  direct causal link between that policy and Miller's death: if HIG and Wellpath had trained staff to

19  properly care for inmates with substance use disorders, undergoing withdrawal and presenting

20  high suicide risks, then the nurses and counselors who saw Miller would likely have recognized a

21  risk of suicide and would not have assigned her to an ordinary cell in the general population.  *See,*

22  *e.g.*, *Pajas v. Cty. of Monterey*, No. 16-00945, 2016 WL 3648686, at *9–11 (N.D. Cal. July 8,

23  2016) (collecting authority and holding allegations of inadequate staffing and inappropriate

24  protocols for treating withdrawal and addiction sufficed to state claim against private contractor

25  for deliberate indifference to inmates' serious medical needs).

26       The court grants Nevada County's motion to dismiss claim three with leave to amend, and

27  denies the motion to dismiss the claims against HIG and Wellpath.

1        **4.      Supervisory Liability under § 1983**

2        The plaintiffs claim Sheriff Moon is liable as a supervisor under § 1983.  "In a § 1983 suit

3   . . . the term 'supervisory liability' is a misnomer."  *Iqbal*, 556 U.S. at 677.  Supervisors can be

4   liable only for their own conduct.  *See Peralta v. Dillard*, 744 F.3d 1076, 1085 (9th Cir. 2014) (en

5   banc).  A plaintiff "may state a claim against a supervisor for deliberate indifference based upon

6   the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her

7   subordinates."  *Baca*, 652 F.3d at 1207.  The complaint must show a supervisor's breach of duty

8   "was the proximate cause of the injury."  *Id.* (citation omitted).

9        The complaint here does not allege the Sheriff made any decisions about Miller's care.  It

10   does little more than recite the elements of a claim for supervisory liability.  It alleges, for

11   example, the Sheriff "knew or should have known that [Miller] had recently used powerful and

12   addictive opioid drugs and abruptly ceased that usage due to her incarceration" but "failed to take

13   the necessary steps to assess [her] mental health condition and to administer appropriate care."

14   FAC ¶ 102.  As explained above, contrary to plaintiffs' argument, the complaint does not identify

15   a pattern of "drug overdose deaths and deaths by suicide" in Nevada County jails "in the previous

16   years."  Opp'n Nev. Cty. Mot. at 12.  Rather, those allegations concern other jails in other

17   counties.  *See id.* ¶¶ 133–37.

18        The court grants Nevada County's motion to dismiss claim four, with leave to amend.

19        **5.      Loss of the Parent-Child Relationship**

20        In claim five, the plaintiffs allege defendants deprived them of their familial relationship

21   with Miller.  "It is well established that a parent has a fundamental liberty interest in the

22   companionship and society of his or her child and that the state's interference with that liberty

23   interest without due process of law is remediable under 42 U.S.C. § 1983."  *Crowe v. Cty. of San

24   Diego*, 608 F.3d 406, 441 (9th Cir. 2010) (quoting *Lee v. City of L.A.*, 250 F.3d 668, 685 (9th Cir.

25   2001)) (alterations omitted).  "To amount to a violation of substantive due process, however, the

26   harmful conduct must 'shock the conscience' or 'offend the community's sense of fair play and

27   decency.'"  *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (quoting *Rochin v.*

28   *California*, 342 U.S. 165, 172–73 (1952)) (alterations omitted).

1    The Supreme Court has held that deliberately indifferent conduct may shock the

2    conscience.  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998).  The Ninth Circuit has

3    applied this doctrine to a defendant's failure to prevent a detained or incarcerated person's

4    apparent suicide.  *See Lemire*, 726 F.3d at 1075.  District judges in this circuit have held that

5    deliberately indifferent actions shock the conscious essentially by definition.  *See, e.g.*, *Estate of*

6    *Prasad ex rel. Prasad v. Cnty. of Sutter*, 958 F. Supp. 2d 1101, 1116 (E.D. Cal. 2013) ("A prison

7    official's deliberate indifference to a prisoner's serious medical needs shocks the conscience and

8    states a claim under the substantive due process clause.").  Neither party here advances an

9    independent argument on this claim.  They refer instead to their arguments about deliberate

10   indifference.  *See* Nevada Cty. Mot. at 11; Opp'n re Nevada Cty. Mot. at 14.

11       The court thus dismisses claim five in part and denies it in part to the same extent as it did

12   in resolving the motions to dismiss claim one.

13                    **6.        Failure to Furnish or Summon Medical Care**

14       The plaintiffs assert a claim against Nevada County under California Government Code

15   section 845.6, which holds both public entities and their employees directly liable if they know or

16   have reason to know a "prisoner is in need of immediate medical care" but do not "take

17   reasonable action to summon such medical care."  The Government Code also "allows for

18   vicarious liability of a municipality" under section 845.6 if an employee violates the statute

19   "when acting within the scope of employment."  *Horton by Horton v. City of Santa Maria*, 915

20   F.3d 592, 605 (9th Cir. 2019) (citing Cal. Gov't Code § 815.2).  But "[l]iability under section

21   845.6 is limited to serious and obvious medical conditions requiring immediate care."  *Jett v.*

22   *Penner*, 439 F.3d 1091, 1099 (9th Cir. 2006) (quoting *Watson v. State*, 21 Cal. App. 4th 836, 841

23   (1993)).

24       Here, the plaintiffs allege Nevada County officers stood by for hours as Miller suffered in

25   pain, called for help, deteriorated, became unresponsive and nearly died.  *See* FAC ¶ 99.  These

26   allegations state a plausible claim for relief under the plain language of section 845.6.

27       Nevada County argues it is immune to these claims under Government Code section

28   844.6, but that section provides an express exception for liability under section 845.6.  *See* Cal.

27

1    Gov't Code § 844.6(a) ("Notwithstanding any other provision of this part, *except as provided . . .*

2    *in Section[] . . . 845.6 . . .* , a public entity is not liable for . . . [a]n injury to any prisoner."

3    (emphasis added)).

4          Nevada County also argues it is immune under Government Code section 855.8, which

5    provides public entities are not "liable for injury resulting from diagnosing or failing to diagnose

6    that a person is afflicted with mental illness or addiction or from failing to prescribe for mental

7    illness or addiction."  The Ninth Circuit rejected an almost identical argument in *Horton*, 915

8    F.3d at 592 ("The complaint alleges that the defendants subjected Horton to 'a delay in and/or

9    denial of medical or mental health care,' not (or at least, not only) that they failed to diagnose or

10   treat his mental illness—a responsibility typically entrusted to a medical professional.").

11   Moreover, it is unreasonable to infer the county's officers were capable or qualified to make any

12   diagnoses.  *See Johnson v. County of Los Angeles*, 143 Cal. App. 3d 298, 316 (1983) ("We hold

13   that as a matter of law a sheriff does not have the authority to make the final determination of

14   diagnosing that a person is, or is not, afflicted with mental illness . . . .").

15         Nevada County relies similarly on Government Code section 856, but that section grants

16   immunity only for decisions "in accordance with any applicable enactment" about whether "to

17   confine a person for mental illness or addiction."  Cal. Gov't Code § 856(a)(1).  There is no

18   allegation the county is liable for confining Miller; rather plaintiff alleges jail personnel did not

19   summon or provide medical care.  Section 856 is not applicable here.  *See Hall v. City of*

20   *Fremont*, 520 F. App'x 609, 612 (9th Cir. 2013) (unpublished) (rejecting immunity claims under

21   section 856 in similar circumstances); *see also Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d

22   425, 448 (1976) (interpreting scope of section 856).

23         The court denies the motion as to claim six.

24              **7.      Negligent Supervision and Training Under State Law**

25         The plaintiffs claim that Nevada County, Sheriff Moon and Kuritzky are liable under the

26   California Government Code for negligent supervision, training, hiring and retention.  FAC

27   ¶¶ 197–201 (citing Cal. Gov't Code §§ 815.2, 820(a) and 820.8).

1    The County argues it is immune from these claims because no statute makes public

2    entities directly liable for negligent training and supervision.  Nevada Cty. Mot. at 12–13.  But

3    "several district courts" have held otherwise.  *Palacios v. Cty. of San Diego*, No. 20-0450, 2020

4    WL 4201686, at *20 (S.D. Cal. July 22, 2020) (citing Cal. Gov't Code § 845.6 and collecting

5    authority).  This court agrees with their reasoning and declines to dismiss the complaint on that

6    basis.

7    The allegations in support of this claim, however, are too vague to allow a plausible

8    inference of liability.  As explained above, the allegations against Sheriff Moon do not say she

9    made any decisions about Miller's care.  *See supra* section III.C.4.  The same is true for the

10   allegations against Kuritzky.  *See* FAC ¶¶ 48, 58.  And the allegations against the County are only

11   generic assertions.  *See id.* ¶ 199.  It appears from plaintiffs' opposition brief that their theory of

12   liability is a form of the *res ipsa loquitor* doctrine of general tort law, i.e., that because employees

13   did not summon or provide care to Miller, their training must necessarily have been deficient.

14   *See* Nevada Cty. Opp'n at 16–17.  They cite no California law to support such a theory of

15   liability, and the court is aware of none.  The federal authorities they cite hold only that the

16   county is not immune to such a claim under Government Code section 815.  *See Estate of*

17   *Claypole v. Cty. of San Mateo*, No. 14-02730, 2014 WL 5100696, at *8 (N.D. Cal. Oct. 9, 2014);

18   *Bock v. Cty. of Sutter*, No. 11-00536, 2012 W L 3778953, at *18–19 (E.D. Cal. Aug. 31, 2012).  It

19   is certainly conceivable that employees who fail to summon care were negligently trained, but a

20   complaint must nudge a plaintiff's claims "across the line from conceivable to plausible."

21   *Twombly*, 550 U.S. at 570.

22   The court grants the motion to dismiss claim seven, with leave to amend.

23   **8.      Wrongful Death**

24   The plaintiffs assert a wrongful death claim against all defendants.  To state a claim for

25   wrongful death, a plaintiff must allege facts showing the defendant's wrongful act or neglect

26   caused the death.  *See* Cal. Civ. Proc. Code § 377.60; *Norgart v. Upjohn*, 21 Cal. 4th 383, 390

27   (1999).  A wrongful death claim may be based on a federal claim of deliberate indifference under

28   § 1983.  *Villarreal v. Cty. of Monterey*, 254 F. Supp. 3d 1168, 1190–91 (N.D. Cal. 2017).

29

Because the complaint here states claims under § 1983 against Mullenax, it also states a claim against her for wrongful death on the same basis.  It is plausible to infer that Mullenax's alleged indifference was a proximate cause of Miller's later suicide in the Sutter County Jail.  If Mullenax had taken greater care and more fully explained Miller's hospitalization, Sutter County could likely have prevented her death a few days later.  *See Conn*, 572 F.3d at 1061 (foreseeable intervening causes do not break chain of causation eventually leading to pretrial detainee's death); *White*, 901 F.2d at 1506 (reasoning similarly).

For similar reasons, the complaint states a claim for wrongful death against HIG and Wellpath.  As discussed above, the complaint states a claim for entity liability against them under § 1983, and the complaint's allegations draw a clear line of cause and effect between Miller's suicide and HIG's and Wellpath's policies for treating inmates with mental health problems and substance use disorders.  *See supra* section III.C.3.

By contrast, the claims against Nevada County, the Sheriff and Kuritzky fall short.  First, as to the County, although a claim for wrongful death may be based on violations of Government Code section 845.6, *see Villareal*, 254 F. Supp. 3d at 1190–91, the complaint offers no explanation for why Nevada County's failure to summon medical care caused Miller's later suicide in the Sutter County Jail.  This claim is dismissed with leave to amend.  Second, as explained elsewhere in this order, the complaint does not state a claim against the Sheriff or Kuritzky under § 1983, Government Code section 845.6, common law negligence or the Bane Act, so the court dismisses the wrongful death claim against them with leave to amend.

### 9.    Negligence

The plaintiffs assert a claim of general negligence against all defendants.  To plead a claim of negligence, a complaint must allege the defendant breached a duty of care to the plaintiff and caused an injury.  *See Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013).  Unless the law provides otherwise, public employees are liable to the same extent as private persons, and "public entities are generally liable for injuries caused by the negligence of their employees acting in the scope of their employment."  *Id.*

30

1    The claims against Nevada County meet this standard because the complaint states a claim

2    against it under Government Code section 845.6.  Its employees did not summon or give medical

3    care to Miller, and as a result, she suffered for hours in her cell, became unresponsive and was

4    hospitalized.  *See Pajas*, 2016 WL 3648686, at *17.  The County enjoys no immunity from these

5    claims because Government Code section 845.6 makes it expressly liable for injuries caused by

6    failures to summon medical care.  *See id.*

7    The allegations against the Sheriff, Mullenax and Kuritzky, by contrast, do not state a

8    claim for negligence.  As explained above, the complaint includes only broad assertions of the

9    Sheriff's and Kuritzky's liability, not factual allegations.  *See supra* sections III.C.1 and III.C.4.

10   The negligence claim against the Sheriff is thus dismissed with leave to amend.  The only

11   allegations that might support a negligence claim against Sergeant Mullenax are the allegations

12   that she did not explain enough about Miller's suicide attempt to Sutter County.  The other claims

13   are too vague.  *See supra* section III.C.1.  But Government Code section 845.6 grants Mullenax

14   immunity from state law claims based on an alleged "failure . . . to furnish or obtain medical care

15   for a prisoner."

16   The plaintiffs do not argue that their allegations against Mullenax state a claim for

17   negligence.  *See* Nevada Cty. Opp'n at 18.  Nor do they explain the basis for their negligence

18   claim against HIG and Wellpath.  *See* HIG Opp'n at 19.  Arguments advanced without

19   explanation or development cannot prevail.  *See Lexington Ins. Co. v. Silva Trucking, Inc.*, No.

20   14-0015, 2014 WL 1839076, at *3 (E.D. Cal. May 7, 2014).

21   The motion is granted in part, again with leave to amend.

22                              **10.     Bane Act**

23   The plaintiffs assert a claim under the Bane Act against all defendants.  FAC ¶¶ 223–30.

24   The Bane Act "protects individuals from conduct aimed at interfering with rights that are secured

25   by federal or state law, where the interference is carried out 'by threats, intimidation or

26   coercion.'"  *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (quoting *Venegas

27   v. Cty. of Los Angeles*, 153 Cal. App. 4th 1230 (2007)).  When a Bane Act claim is based on an

28   alleged federal constitutional violation, as here, plaintiffs may rely on the same allegations to

31

1    prove both that the defendant deprived them of a constitutional right and threatened, intimidated

2    or coerced them under the Bane Act.  *See id.* at 1043 ("[T]he Bane Act does not require the

3    'threat, intimidation or coercion' element of the claim to be transactionally independent from the

4    constitutional violation alleged.").  But the claim must also rest on factual allegations that would

5    allow an inference the defendant had a "specific intent" to violate the plaintiff's rights.  *See id.*

6    (quoting *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).  These rules

7    are applicable to claims of deliberate indifference to serious medical needs.  *See Lapachet v.*

8    *California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1196 (E.D. Cal. 2018).

9           The plaintiffs' allegations that Mullenax, HIG and Wellpath were deliberately indifferent

10   support their claims against those defendants under the Bane Act.  "[A] prison official's

11   deliberate indifference to serious medical needs is a coercive act that rises above mere negligence

12   . . . . [P]leading 'reckless disregard of the right at issue is all that is necessary.'"  *Scalia v. Cty. of*

13   *Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) (other alterations omitted) (quoting *Cornell*,

14   17 Cal. App. 5th at 803).  Beyond these allegations, the officials' subjective "intent" is a question

15   for the factfinder and another day.  *See Cornell*, 17 Cal. App. 5th at 803 ("[T]he jury must make

16   the second, factual, determination[:] Did the defendant commit the act in question with the

17   particular purpose of depriving the citizen victim of his enjoyment of the interests protected by

18   that right?" (other alterations omitted) (quoting *People v. Lashley*, 1 Cal. App. 4th 938, 949

19   (1991)).

20          The plaintiffs identify no other basis for their Bane Act claims beyond their federal

21   constitutional allegations.  *See* Nevada Cty. Opp'n at 19–20; HIG Opp'n at 19–20.  For that

22   reason, and because the complaint does not state constitutional claims against any defendants

23   other than Mullenax, HIG and Wellpath, the court dismisses the Bane Act claims against the other

24   defendants, with leave to amend.

25                    **11.    Americans with Disabilities Act and Rehabilitation Act**

26          Plaintiffs assert claims under the Americans with Disabilities Act and the Rehabilitation

27   Act against the two Counties, HIG and Wellpath.

1          Title II of the ADA applies to state and local governments.  *See Daubert v. Lindsay*

2    *Unified Sch. Dist.*, 760 F.3d 982, 985 (9th Cir. 2014); *Pierce v. Cty. of Orange*, 526 F.3d 1190,

3    1214–15 (9th Cir. 2008).  It broadly forbids discrimination on the basis of disability.  *See* 42

4    U.S.C. § 12132.  To state a claim under Title II of the ADA, plaintiffs must allege they (1) have a

5    disability; (2) are "otherwise qualified to participate in or receive the benefit of some public

6    entity's services, programs, or activities;" (3) were "either excluded from participation in or

7    denied the benefits of the public entity's services, programs, or activities" or were "otherwise

8    discriminated against by the public entity"; and (4) the exclusion, denial of benefits, or

9    discrimination "was by reason of [the] disability."  *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011,

10   1021 (9th Cir. 2010) (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004)),

11   *overruled in part on other grounds by Castro*, 833 F.3d 1060.

12         Section 504 of the Rehabilitation Act similarly prohibits discrimination "under any

13   program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  Plaintiffs

14   must show they (1) have a disability; (2) are "'otherwise qualified' to receive the benefit";

15   (3) were "denied the benefits of the program solely by reason of . . . disability"; and [also that]

16   (4) the program receives federal financial assistance."  *Weinreich v. L.A. Cnty. Metro. Transp.*

17   *Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (emphasis, footnote, and citations omitted).

18         Here, the plaintiffs allege that Nevada County, HIG and Wellpath discriminated against

19   Miller because they did not provide the services she needed and did not accommodate her mental

20   health condition.  *See* FAC ¶¶ 232–39.  In other words, they allege Miller received inadequate

21   treatment for her mental health condition.  The ADA does not prohibit "inadequate treatment for

22   disability."  *Simmons*, 609 F.3d at 1022.  It does not "create a remedy for medical malpractice."

23   *Id.* (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)).  And because "[t]here is no

24   significant difference in analysis of the rights and obligations created by the ADA and the

25   Rehabilitation Act," *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999),

26   the court concludes the same is true for section 504 of the Rehabilitation Act.

27         This claim is dismissed, but with leave to amend if possible.

1          **12.     Unruh Act**

2          The plaintiffs assert a claim under the California Unruh Civil Rights Act against HIG and

3    Wellpath.  The Unruh Act "guarantees every person in California 'full and equal' access to 'all

4    business establishments of every kind whatsoever.'"  *Isbister v. Boys' Club of Santa Cruz, Inc.*,

5    40 Cal. 3d 72, 75 (1985) (quoting Cal. Civ. Code § 51).  It prohibits discrimination on the basis of

6    several characteristics, including "disability," which includes "any mental or physical disability."

7    Cal. Civ. Code § 51(b) & (e)(1).  Plaintiffs must plead intentional discrimination to obtain relief

8    under the Unruh Act.  *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1149 (1991),

9    *superseded by statute on other grounds as stated in Munson v. Del Taco, Inc.*, 46 Cal. 4th 661,

10   665 (2009).  Plaintiffs pursuing Unruh Act claims in federal courts may not rely on a conclusory

11   allegation of intentional discrimination.  *Grier v. Brown*, 230 F. Supp. 2d 1108, 1120 (N.D. Cal.

12   2002).

13         Here, the complaint asserts conclusions rather than alleging facts to claim HIG and

14   Wellpath discriminated intentionally.  For example, the complaint states that HIG and Wellpath

15   denied Miller access to unspecified "programs and services" and gave her "quality of care and

16   service that [was] different, separate, and worse than the service provided to other individuals

17   with the same disabilities."  FAC ¶ 244.

18         This claim is thus dismissed, with leave to amend.

19   **IV.     CONCLUSION**

20         The request for judicial notice, ECF No. 55, and the motion to strike, ECF No. 58, are

21   **denied as moot**.  The motions to dismiss, ECF Nos. 46 and 50, are **granted in part and denied**

22   **in part**:

23                 •   Claims one, two, four and five against Kuritzky are dismissed with leave to

24                     amend.

25                 •   Claim one against Nevada County, Sutter County, HIG and Wellpath is dismissed

26                     without leave to amend.

27   /////

28   /////

34

1       •  Claim one against Sheriff Moon is dismissed with leave to amend.

2       •  Claim one against Sergeant Mullenax is dismissed with leave to amend insofar as

3           that claim relates to the treatment of Miller's opioid-related medical crisis.  The

4           motion is denied for the claim that Mullenax acted with deliberate indifference

5           when returning Miller to Sutter County's custody.

6       •  The motions to dismiss claim two are granted in part and denied in part to the

7           same extent as the motions to dismiss claim one.

8       •  Nevada County's motion to dismiss claim three is granted with leave to amend,

9           and the motion to dismiss claim three against HIG and Wellpath is denied.

10       •  Nevada County's motion to dismiss claim four is granted with leave to amend.

11       •  The motions to dismiss claim five are granted in part and denied in part to the

12           same extent as the motions to dismiss claim one.

13       •  Nevada County's motion to dismiss claim six is denied.

14       •  The motion to dismiss claim seven is granted with leave to amend.

15       •  The motions to dismiss claim eight are denied with respect to the claims against

16           Mullenax, HIG and Wellpath.  Claim eight against Nevada County, Sheriff Moon

17           and Kuritzky is dismissed with leave to amend.

18       •  The motion to dismiss claim nine against Nevada County is denied.  Claim nine is

19           otherwise dismissed with leave to amend.

20       •  The motions to dismiss claim ten against Mullenax, HIG and Wellpath are denied.

21           Claim ten against the other defendants is dismissed with leave to amend.

22       •  Claim eleven is dismissed with leave to amend.

23       •  Claim twelve is dismissed with leave to amend.

24      Plaintiffs are directed to file any second amended complaint **within twenty-one days**.

25 The complaint must correctly identify Miller's estate and its administrator and must be supported

26 by a declaration that complies with California Code of Civil Procedure section 377.32.  The

27 /////

35

1    plaintiffs may amend their claims and allegations as permitted in this order if possible within the

2    confines of Rule 11.

3              IT IS SO ORDERED.

4    DATED:  October 30, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE